UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES TSA
LOCAL 1, *et. al.*,

   Plaintiffs,

    v.

EDMUND HAWLEY,
Administrator, Transportation Security
Administration

   Defendant.

Civil Action No. 03-1719 (CKK)

**MEMORANDUM OPINION**
(August 21, 2006)

Plaintiffs American Federation of Government Employees TSA Local 1 ("AFGE"),

Eugene Leimer, Don Card, Beatrice Campbell, Thomas Moriarty, and Jonathan Thorton bring

this action against Edmund Hawley[1] in his capacity as Administrator[2] of the Transportation

Security Administration ("TSA"), U.S. Department of Homeland Security, challenging the

legality of the TSA's May 2003 Reduction in Force ("RIF"), which implemented a workforce

reduction of around 3,000 airport security screeners, including Plaintiffs.[3]  The reduction was

necessitated by initial overstaffing as the TSA rapidly responded to Congress's mandate to

"deploy at all airports . . . a sufficient number of Federal screeners . . . to conduct the screening

of all passengers" within one year of the November 19, 2001 enactment of the Aviation and

---

[1]  Formerly James Loy.  Edmund Hawley was automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).
[2]  Hereinafter "Under Secretary," in keeping with the terminology of the original ATSA. The title of the head of the TSA changed from Under Secretary to Administrator when the TSA merged into the Department of Homeland Security in November 2002.
[3]  With the exception of the AFGE.

Transportation Security Act ("ATSA"), Public Law 107-71 of the 107th Congress.  ATSA § 111(n), Pub. L. 107-71, 115 Stat. 597 (2001).

Following this Court's denial of Plaintiffs' Motion for a Preliminary Injunction and deferral of Plaintiffs' Motion for Class Action Certification, Defendant filed a [10] Motion to Dismiss, followed by Plaintiffs' Opposition and Defendant's Reply.  Upon consideration of the filings before the Court, the relevant statutes and case law, and the entire record herein, the Court shall grant Defendant's Motion with respect to all Counts except Count VI with respect to Plaintiff Card and Plaintiff AFGE.

The central question in this case is whether ATSA § 111(d), 49 U.S.C. § 44935 note, exempts the TSA Under Secretary from following the ATSA's generally applicable personnel management provisions, ATSA § 101(n), 49 U.S.C. § 114(n), when hiring and firing airport security screeners.  This Court finds, primarily for the reasons expressed in *Springs v. Stone*, 362 F. Supp. 2d 686 (E.D. Va. 2005), and *In re Department of Homeland Security Border and Transportation Security Directorate Transportation Security Administration and AFGE, AFL-CIO*, Decision and Order on Petitions, No. WA-RP-03-0023 (F.L.R.A. July 7, 2003) (hereinafter "*In re TSA and AFGE*"), that ATSA § 111(d), 49 U.S.C. § 44935 note gives the Under Secretary broad discretion to exempt screeners from the protections of federal personnel laws, particularly those in part III of title V, United States Code.  ATSA § 101, 49 U.S.C. § 114(n), governs TSA personnel management only for non-screener TSA employees.[4]

Plaintiffs' specific claims include that the TSA RIF:  (1) violated the ATSA by failing to follow the Act's Federal Aviation Administration (FAA) personnel management provisions, (2)

---

[4] As used in this Opinion, the term "federal personnel laws" refers specifically to federal laws governing terms and conditions of employment for federal civil servants.  As used in this Opinion, "federal personnel laws" does not encompass federal employment laws, such as the Age Discrimination in Employment Act (ADEA), that apply generally to federal and private sector employees alike.

violated the ATSA and Veterans' Preference Act of 1944 ("VPA"), 5 U.S.C. § 3901 *et seq.*, by

not taking into account military service, tenure of employment, and efficiency ratings, (3)

violated the Administrative Procedure Act (APA) as an arbitrary and capricious agency action,

(4) violated the Age Discrimination in Employment Act (ADEA) by disparately impacting

screeners over 40 years old, (5) violated the ATSA § 110(c) by not deploying "a sufficient

number of Federal screeners" to conduct screening of all passengers, (6) violated Plaintiffs' First

Amendment rights of free speech and association by disparately impacting union activists, and

(7) violated Plaintiffs' Fifth Amendment due process rights by advertising that RIFed employees

were terminated for poor job performance. *See* Compl. ¶¶ 38-39 (Count I – ATSA 101), ¶¶ 40-

41 (Count II – VPA), ¶¶ 42-43 (Count III – APA), ¶¶ 44-46 (Count IV – ADEA), ¶¶ 47-48

(Count V – ATSA 110(c)), ¶¶ 49-51 (Count VI – 1st amend.), ¶¶ 52-55 (Count VII – 5th

amend.).  Counts I, II, and III are all dependent on whether ATSA § 111(d) or ATSA § 101

governs the TSA's personnel management system for screeners.

    For the reasons that follow, the Court shall dismiss all of Plaintiffs' claims except Count

VI with respect to Plaintiff Card, because:  (1) the TSA RIF did not violate ATSA § 101 by

failing to establish the FAA's personnel management system for screeners, because ATSA §

111(d) exempts the TSA from that requirement with respect to screeners, (2) the TSA RIF did

not violate the ATSA or the Veterans' Preference Act by not taking into account military

service, tenure of employment, and efficiency ratings, because ATSA § 111(d) grants the TSA

power to incorporate or not incorporate such standards into screener terminations at the TSA's

discretion, (3) this Court does not have jurisdiction to adjudicate Count III, because the ATSA

commits RIF procedures to TSA discretion, (4) Count IV has failed to state a claim upon which

relief can be granted, because under the ADEA, claims of discrimination based on disparate

impact are not cognizable, (5) TSA screeners are not within the "zone of protection" of ATSA §

110(c), and so lack standing to pursue Count V, (6) Plaintiffs, except for Plaintiff Card, have

failed to state a claim under the First Amendment, because they fail to allege that their

termination was in any way causally connected with their union activities, and (7) Plaintiffs have

failed to state a claim under the Fifth Amendment, because they fail to allege that the

"disparaging" Press Release so seriously hampered or constrained their employment

opportunities as to deprive them of a liberty interest protected by the 5th Amendment.

## I: BACKGROUND

A.      *Statutory Framework*

Less than ten weeks after the September 11, 2001 terrorist hijackings of four commercial

airliners, Congress enacted the Aviation and Transportation Security Act ("ATSA"), Pub. L. No.

107-71, 115 Stat. 597 (2001), *as codified in* 49 U.S.C. § 114 *et seq.*, in order to improve airport

security.  The central feature of the Act is federalization of the nation's transportation security

system through creation of the Transportation Security Administration ("TSA").  Most

importantly, Congress mandated that "Not later than 1 year after the date of enactment of this

Act, the Under Secretary of Transportation for Security [head of the TSA] shall deploy at all

airports in the United States where screening is required under section 44901 of title 49, United

States Code, a sufficient number of Federal screeners . . . to conduct the screening of all

passengers and property. . . ."  ATSA § 110(c), 49 U.S.C. § 44901 note.

The legislative history of the ATSA reveals disagreement concerning the employee

protections the Act should mandate for TSA airport security screeners.[5]  In their final versions,

the two provisions at issue in this case provide as follows:

---

[5] Except as otherwise noted, the source of these facts is the thorough compilation of
legislative history of ATSA §§ 111(d) and 101 in *In re TSA and AFGE*, No. WA-RP-03-
0023 (F.L.R.A. July 7, 2003).

4

ATSA § 111(d), 49 U.S.C. § 44935 note, provides, in its entirety:

> (d) Screener Personnel.—Notwithstanding any other provision of law, the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under section 44901 of title 49, United States Code.  The Under Secretary shall establish levels of compensation and other benefits for individuals so employed.

ATSA § 101, 49 U.S.C. § 114(n), provides:

> (n)  Personnel management system.—The personnel management system established by the Administrator of the Federal Aviation Administration under [49 U.S.C.] section 40122 shall apply to employees of the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the personnel management system with respect to such employees as the Under Secretary considers appropriate. . . .

Section 111(d) emerged originally from Senate Bill S. 1447, while section 101 emerged originally from House Bill H.R. 3501.  After conference, both provisions appeared in the final bill, Public Law 107-71.

Section 111(d) evolved out of an earlier Senate provision intended to provide the Under Secretary with authority to hire (i) any necessary number of screeners, without regard to any limitation on the number imposed by any law or Executive Order, (ii) but with the employee protections of part III of title 5 applicable to all screeners hired.  The original provision in S. 1447, as introduced on September 21, 2001, provided:

> Sec. 10.  Training and employment of security screening personnel.
>
> (f) Authorization of Employment.—The Secretary of Transportation is authorized to employ, appoint, and fix the compensation of such a number of individuals as may be necessary to carry out sections 44901 and 44903 of title 49, United States Code, in accordance with the provisions of part III of title 5, United States Code, without regard to any limitations on number of employees imposed by any other law or Executive Order.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 7 n.20 (F.L.R.A. July 7, 2003).  This provision

was amended by the Senate on October 10, 2001 by Senate Amendment 1854, to read:

> Sec. 10.  Training and employment of security screening personnel.
>
> (d) Expedited personnel process.—
> (1) Authorization of employment.—The Secretary of Transportation may appoint
> and fix the compensation of such a number of individuals as may be necessary to
> carry out section 44901 and 44903 of title 49, United States Code, in accordance
> with the provisions of part III of title 5, United States Code, without regard to any
> limitations on number of employees imposed by any other law or Executive
> Order.
> (2) Strikes prohibited.—An individual employed as a security screener is
> prohibited from participating in a strike or asserting the right to strike pursuant to
> section 7311(3) or 7116(b)(7) of title 5.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 8 n.20 (F.L.R.A. July 7, 2003).  The provision

was further amended by Senate Amendment 1881 on October 11, 2001.  The purpose of Senate

Amendment 1881 was "[t]o authorize the employment, suspension, and termination of airport

passenger security screeners without regard to the provision of title 5, United States Code,

otherwise applicable to such employees."  *In re TSA and AFGE*, No. WA-RP-03-0023 at 8 n.20

(F.L.R.A. July 7, 2003) (quoting 147 Cong. Rec. S10520 (Oct. 11, 2001)).  Senate Amendment

1881 replaced the above subsections with:

> (d) Screener personnel.—Notwithstanding any other provision of law, the
> Secretary of Transportation may employ, appoint, discipline, terminate, and fix
> the compensation, terms, and conditions of employment of such a number of
> individuals as the Secretary determines to be necessary to carry out the passenger
> security screening functions of the Secretary under section 44901 of title 49,
> United States Code.
> (e) Strikes prohibited.—An individual employed as a security screener under
> section 44901 of title 49, United States Code, is prohibited from participating in a
> strike or asserting the right to strike pursuant to section 7311(3) or 7116(b)(7) of
> title 5, United States Code.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 8 n.20 (F.L.R.A. July 7, 2003).  No other changes

of significance to this case were made to this provision in S. 1447 that differentiate it from the

final version appearing in Pub. L. 107-71, cited above.

ATSA § 101, meanwhile, came originally from House bill H.R. 3150, introduced on

October 17, 2001.  Section 101 provides that the personnel management system of the FAA

apply to TSA employees.  The FAA personnel management system is more "flexible" than that

applicable to most federal employees, in that only enumerated employee protections of federal

personnel laws apply, including whistleblower protection, veterans' preference, non-

discrimination, insurance, and appeals to the Merit Systems Protection Board.  *See* 49 U.S.C. §

40122(g).  Importantly, unlike the bill passed by the Senate, the House bill contemplated that

section 101's employee protections would not apply to security screeners, because it mandated

only federal oversight of screeners, but not federal employment:

> (e) Supervision of screening.—All screening of passengers and property at
> airports under this section shall be supervised by uniformed Federal personnel of
> the Transportation Security Administration who shall have the power to order the
> dismissal of any individual performing such screening.
> (f) Limitation on right to strike.—An individual that screens passengers or
> property, or both, at an airport under this section may not participate in a strike, or
> assert the right to strike, against the person (including a government entity)
> employing such individual to perform such screening.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 9 n.21 (F.L.R.A. July 7, 2003).

Initially, the House rejected the Senate's version of the TSA legislation, rejecting on

November 1, 2001 H. Amdt. 384, which would replace the text of H.R. 3150 with text identical

to S. 1447.  *Id.*  Some Representatives objected that S. 1447 "gives the [head of the TSA] broad

discretion over pay, health care, whistleblower protection, veterans' preference, workers'

compensation, and the right to organize."  *TSA and AFGE* at 10, n.21  (F.L.R.A. July 7, 2003)

(quoting 147 Cong. Rec. H7648 (Nov. 1, 2001)).  Another Representative criticized the Senate

bill for not "even giv[ing] these employees the protection of fair labor standards . . .

nondiscrimination acts, all of the law that provides family and medical leave. . . ." *Id.* H.R.

3150 – with Section 101 but without federalization of screeners – was passed by the House and

sent to conference on November 6, 2001.

The bill that emerged from conference on November 19, 2001 adopted the Senate's

formulation of the Under Secretary's authority to determine the terms of employment of TSA

screeners.  Sen. John Rockefeller remarked that the "critical matters" of "health care, worker's

compensation, and civil rights and whistleblower protection . . . are left to the discretion of the

Department of Transportation. . . ."  *In re TSA and AFGE*, No. WA-RP-03-0023 at 7 (F.L.R.A.

July 7, 2003) (quoting 147 Cong. Rec. S11982 (Nov. 16, 2001)).  House Rep. Janice

Schakowsky expressed her "understanding that the Secretary is given the authority to determine

whether [screeners] can join a union; participate in the Federal Employees Health Benefit Plan

and retirement options; and be covered by non-discrimination, health and safety, and

whistleblower laws."  *In re TSA and AFGE*, No. WA-RP-03-0023 at 7 n.20 (F.L.R.A. July 7,

2003) (quoting 147 Cong. Rec. H8313 (Nov. 16, 2001)).  Both expressed their "hope[s] that the

Secretary will act to give those benefits and rights to federal screeners and security workers."  *Id.*

B.    *The Reduction in Force*

Between April and December 2002, the TSA hired more than 62,000 screening personnel

in a "dynamic, high pressure rollout" to meet Congress's mandate to "deploy at all airports . . . a

sufficient number of Federal screeners . . . to conduct the screening of all passengers" within one

year of the November 19, 2001 enactment of the ATSA.  Def.'s Opp'n to Pls.' Mot. for Prelim.

Inj., Ex. 1 (8/25/03 Whitford Decl.) (hereinafter "Whitford Decl.") ¶¶ 5-6.  Due to "haphazard or

ill-planned deployment of personnel," however, approximately 400 airports became either

overstaffed or understaffed. *Springs v. Stone*, 362 F. Supp. 2d 686, 690-91 (E.D. Va. 2005) (citations omitted); Whitford Decl. ¶ 8. Though it had met congressional deadlines, TSA now was concerned with its "obligation as stewards of taxpayer money." Whitford Decl., Tab A (4/30/03 Letter from James Loy to TSA Screeners). TSA consequently rolled out a "right-sizing" plan that called for elimination of 3,000 screener positions by May 31, 2003, and another 3,000 by September 30, 2003.[6] *Id.*

Recognizing that "a traditional seniority-based reduction was not feasible given that all hiring had taken place airport by airport only within the past year," the TSA Guidance Team responsible for "right-sizing" the screener workforce developed a competency-based process for terminating screeners, based on tests of measuring a screener's ability to identify x-ray images of prohibited items in luggage, knowledge of screening procedures, . Whitford Decl. ¶¶ 11, 20, 22. Due to the May 30, 2003 deadline for eliminating 3,000 screener positions, however, the first phase of the reduction incorporated only a conduct checklist, "which identified previously documented on-the-job conduct and performance issues," in the competency evaluation. *Id.* ¶¶ 22, 25. Officials at overstaffed airports completed the checklists and forwarded them to TSA Headquarters for review. *Id.* ¶ 26. Approximately 800 TSA screeners were terminated via letters on May 23 and May 30, 2003. Compl. ¶ 30; *Springs*, 362 F. Supp. 2d at 692. The remaining 2,200 of the targeted 3,000 employees were eliminated through attrition. *Springs*, 362 F. Supp. 2d at 692.

All Plaintiffs in this case were among those "RIFed" in late May 2003. Compl. ¶ 30. Plaintiffs' separation letters stated that separation was as a result of overstaffing resulting from budget allocations and "not for cause." *Id.* A TSA press release of May 30, 2003 reassured the

_____

[6] The "right-sizing" plan is also known as a Reduction In Force, or "RIF."

public that the screener job cuts would have no impact on security or passenger wait times.

Compl., Ex. 4 (5/30/03 TSA Press Release).[7]  The press release also stated that:

> Whenever possible, normal attrition, including resignations and retirements, is being used for rightsizing at individual airports.  Employees may be terminated for cause, including criminal background, failure to pass drug and alcohol tests, and falsification of employment documents.  Beyond that, the actual reductions in force are based on job performance.

*Id.*  Plaintiffs Leimer, Card, Moriarty, and Thorton are all veterans.  Compl. ¶ 31.  Plaintiffs

Leimer, Card, Campbell, and Moriarty were all over 40 years old.  *Id.* ¶ 32.  All Plaintiffs were

union activists.  *Id.* ¶ 33.

Based on the foregoing events and their interpretation of the ATSA provisions, Plaintiffs

filed an action in this Court on August 13, 2003, claiming *inter alia* that TSA's RIF violated the

ATSA by failing to take into account seniority and veterans' preference as mandated by section

101; violated other federal employee-protection laws, including the VPA protections for

veterans, APA protections against arbitrary and capricious agency actions, and ADEA

protections against age discrimination; and violated the First and Fifth Amendments to the U.S.

Constitution by hampering their freedom to join a union and by making disparaging public

remarks in the press release.  Following this Court's denial of Plaintiffs' Motion for a

Preliminary Injunction and deferral of Plaintiffs' Motion for Class Action Certification,

Defendant now moves this Court to dismiss all Plaintiffs' claims.

## II: LEGAL STANDARDS

A.    *Motion to Dismiss*

1.    Rule 12(b)(1)

---

[7] Plaintiffs' exhibits are in fact attached to their Motion for Preliminary Injunction, and not the Complaint, but for convenience were not resubmitted to the Court.

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1).  In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  A court may appropriately dispose of a case under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*, 223 F. Supp. 2d 139, 152 n.1 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)).  At the stage in litigation when dismissal is sought, the plaintiffs' complaint must be construed liberally, and plaintiffs should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiffs' burden to prove subject matter jurisdiction by a preponderance of the evidence.  *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

      2.        Rule 12(b)(6)

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, unlike resolving a motion under Rule 12(b)(1), the court must construe the complaint in a light most favorable to the plaintiffs and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiffs' favor, it "need not accept inferences drawn by the plaintiffs if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276. Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See St. Francis Xavier Sch.*, 117 F.3d at 624; *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

B.    *Standards for Administrative Agency Review*

Plaintiffs in this case challenge the Transportation Security Agency's construction of the ATSA, specifically, the Agency's interpretation of the sections 111(d) and 101. The standard for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's

decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843). Under the *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43; *see also id.* at 843 n.9 ("[A]dministrative constructions which are contrary to clear congressional intent" must be rejected by the court). "When performing this first step, [courts] employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842–43; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987)). Among these tools is a statute's framework and legislative history. *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172 (D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 134 (D.D.C. 1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d 1173, 1178 (D.C. Cir. 1995)). However, canons of construction are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir. 1989) (emphasis in original). In conducting

this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL-CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO*, 333 F.3d at 173. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. However, if the Agency's interpretation unduly compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845 (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express purpose, the court may – indeed must – intervene and correct the agency.").

### III: DISCUSSION

The Court first discusses the central question in this case – the meaning of ATSA § 111(d), 49 U.S.C. § 44935 note – and then addresses Plaintiffs' Counts I to VII in turn.

    *A.*    *The Meaning of ATSA § 111(d), 49 U.S.C. § 44935 note*

The central question in this case is whether ATSA § 111(d), 49 U.S.C. § 44935 note, exempts the TSA Under Secretary from following the ATSA's generally applicable personnel management provisions, ATSA § 101, 49 U.S.C. § 114(n), when hiring and firing airport security screeners. This question has been previously addressed by the Federal Circuit in *Conyers v. Merit Systems Protection Board*, 388 F.3d 1380 (Fed. Cir. 2004), the Eastern District of Virginia in *Springs v. Stone*, 362 F. Supp. 2d 686 (E.D.Va. 2005), and the Federal Labor Relations Authority in two cases, *In re TSA and AFGE*, No. WA-RP-03-0023 (F.L.R.A. July 7, 2003), and its appeal in *In re United States Department of Homeland Security and Transportation Security Directorate Transportation Security Administration and American Federation of Government Employees AFL-CIO*, 59 F.L.R.A. 423, 2003 WL 22669101 (November 4, 2003).[8] These tribunals all concluded that ATSA § 111(d) renders all other federal personnel statutes, including ATSA § 101, inapplicable to the Under Secretary's powers to "employ, appoint, discipline, [and] terminate" screeners. The D.C. Circuit Court of Appeals touched on the question in *AFGE v. Loy*, 367 F.3d 932 (D.C. Cir. 2004), but concluded the question was not properly before the court.

---

[8] In *Whitman v. Department of Transportation*, 126 S.Ct. 2014 (2006), the Supreme Court addressed a question tangentially related to the current action: whether federal courts have jurisdiction to hear claims by federal employees covered by the Civil Service Reform Act (CSRA), including Chapter 71 of Title 5, 49 U.S.C. § 40122(g). In this case, because the Court finds that ATSA allows the TSA Under Secretary to exempt TSA security screeners from the CSRA, and the Under Secretary in fact exempted them, the jurisdictional exclusions in the CSRA do not apply.

In *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), the Court of Appeals for the D.C. Circuit construed the Homeland Security Act's ("HSA") mandate that the Department of Homeland Security must ensure collective bargaining for its employees. The question of whether the TSA, now a part of DHS, must ensure collective bargaining for TSA security screeners is not before this Court. The Court only notes that the question was decided in *In re TSA and AFGE*, No. WA-RP-03-0023 at 19-28 (F.L.R.A. July 7, 2003). That tribunal decided that the HSA did not alter the effect of ATSA § 111(d).

This Court finds, primarily for the reasons expressed in *In re TSA and AFGE* (F.L.R.A. July 7, 2003), that ATSA § 111(d), 49 U.S.C. § 44935 note, gives the TSA Under Secretary broad discretion in screener employment decisions.  ATSA § 101, 49 U.S.C. § 114(n), governs TSA personnel management only for non-screener TSA employees.  The plain text of the statute shows that Congress intended to invest the TSA Under Secretary with authority to exempt security screeners from the employee protections of otherwise applicable federal personnel laws. Furthermore, the ATSA's legislative history abolishes any possible ambiguity in the statute's meaning.

> 1.   The "Plain Meaning" of ATSA Sections 111(d) and 101 Shows That Congress Intended to Invest the TSA Under Secretary with Authority to Exempt Security Screeners from the Employee Protections of Otherwise Applicable Federal Personnel Laws

With respect to statutory construction, the Supreme Court has emphasized that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291(1988) (citations omitted).  The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text."  *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 400.  That is, the court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used."  *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149 (1984) (internal quotation and citations omitted).  "Where [] the plain language of the statute is clear, the court generally will not inquire further into its meaning."  *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).  If the plain language of the statute is unclear or ambiguous, it is appropriate to examine the legislative history of the statute to determine the intent of Congress.  *TSA and AFGE* (F.L.R.A. July 7, 2003) (citing *Munson v. Merit Systems Protection Board*, 216 F.3d 1037, 1040 (Fed. Cir. 2000); *AFGE, Local 3295 v.*

16

*FLRA*, 46 F.3d 73, 77 (D.C. Cir. 1995) (Wald, C.J., dissenting)).   The project for the court is in

both cases to determine the intent of Congress when applying the statute.

     In its entirety, the Section 111(d) reads:

> Notwithstanding any other provision of law, the Under Secretary of
> Transportation for Security may employ, appoint, discipline, terminate, and fix
> the compensation, terms, and conditions of employment of Federal service for
> such a number of individuals as the Under Secretary determines to be necessary
> to carry out the screening functions of the Under Secretary under section 44901 of
> title 49, United States Code.  The Under Secretary shall establish levels of
> compensation and other benefits for individuals so employed.

49 U.S.C. § 44935 note.

     Plaintiffs argue that Section 111(d) does not grant the Secretary discretion to not apply

the FAA personnel management system to screeners, because "[b]oth parties agree that ATSA

explicitly mandates that the TSA adopt the personnel system in place at the Federal Aviation

Administration (FAA) for their employees at large" and "notwithstanding" language should not

"negate[] an earlier provision *of the same law*."  Pls.' Opp'n at 12, 14 (citing ATSA § 101, 49

U.S.C. §  114(n)).  Defendant counters that "[t]he statutory command [of Section 111(d)] is plain

and incontrovertible," showing "the unambiguously expressed intent of Congress" to give the

Under Secretary unfettered discretion concerning airport security screener personnel decisions.

Def.'s Mem. to Dismiss at 10, 13, 16.

     The Court finds that the plain text favors Defendant's interpretation for several reasons.

First, a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the

'notwithstanding' section override conflicting provisions of any other section."  *Springs*, 362 F.

Supp. 2d at 697 (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993)); *see also*

*Shomberg v. United States*, 348 U.S. 540, 547-48 (1955) (by using "'notwithstanding' language .

. . Congress clearly manifest[s] its intent that certain policies should override" other provisions

in a statute); *AFGE v. FLRA*, 46 F.3d 73, 76 (D.C. Cir. 1995) (finding the phrase

"notwithstanding any other provision of law" to vest broad discretion in a federal agency);

*Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (noting that a

"clearer statement of law" than a 'notwithstanding clause "is difficult to imagine").  Second,

throughout the ATSA, Congress gave specific attention towards screeners as different from other

classes of employees covered by the Act.  *See Springs*, 362 F. Supp. 2d at 699 (noting that

"[t]here is a rational basis for distinguishing, as Congress has done, between airport security

screeners and other TSA employees. . . . A different choice might have been made but Congress

could rationally conclude that airport security requires federal employees who operate with more

flexibility than either civil service or collectively-bargained protections and procedures would

allow.").  Related to this point, Defendant notes that "[w]hile screeners are collectively the vast

majority of TSA employees, non-screener position <u>types</u> are far more numerous" so that 101

might be intended to "cover the many different kinds of positions for which Congress could not

be expected to legislate more specifically."  Def.'s Reply at 13 n.8.  Third, Congress juxtaposed

a long list of personnel functions – "employ, appoint, discipline, terminate, and fix the

compensation, terms, and conditions of employment" – with the "notwithstanding any other

law" phrase, and in addition provided the section's final sentence that "The Under Secretary

shall establish levels of compensation and other benefits for individuals so employed."  49

U.S.C. § 44935 note.  The list of functions and final sentence emphasize the section's focus on

the Secretary's power to set terms of employment and termination.  Finally, Congress

"frequently exempts federal agencies from the provisions of federal personnel laws."  Def.'s

Mem. to Dismiss at 13 (citing *Gardner v. Library of Congress*, 774 F.2d 1081 (Fed. Cir. 1985);

*Wilks v. Army*, 91 M.S.P.R. 70 (2002); *Beckstrom-Parcell v. Veterans Affairs*, 91 M.S.P.R. 656

(2002)).  As such, the Court finds that the plain text of Section 111(d) clearly signals Congress's

intention to grant the TSA Under Secretary authority to design a personnel management system

for airport security screeners, to include or not include at the Secretary's discretion provisions of

other federal personnel laws, including those in the FAA's personnel management system in 49

U.S.C. § 40122(g).

Plaintiffs make several arguments contesting this conclusion.  First, Plaintiffs argue that a

"RIF is neither part of employment, appointment, disciplinary action, termination or a term or

condition of employment. . . ." Pls.' Opp'n at 13.  Plaintiffs contend that "a RIF is not a

termination," but rather "a separation from employment due to reasons unrelated to cause."  *Id.*

In support, Plaintiffs cite cases in which courts found that a "reduction-in-force" is not

encompassed by "condition of employment," citing *James v. Von Zemenszky*, 284 F.3d 1310

(Fed. Cir. 2002), or that a RIF is not a termination, citing *Brooks v. Board of Commissioners of*

*Chicago Housing Authority*, 1998 WL 214669 (N.D. Ill. 1998).  Defendant counters that, "to the

extent case law informs the issue, the D.C. Circuit . . . has previously used the terms 'RIF,'

'termination,' and 'separation' synonymously: 'In so arguing, the Union acknowledges that

RIF'd teachers have available several avenues for challenging their removals in post-termination

hearings if they believe either that their terminations were discriminatory or retaliatory, or that

notice and separation procedures were not followed.'" Def.'s Reply at 11-12 (citing *Washington*

*Teachers' Union Local No. 6, Am. Federation of Teachers, AFL-CIO v. Board of Educ. of the*

*Dist. of Columbia*, 109 F.3d 774, 779 (D.C. Cir. 1997) (emphasis added)).  In the Court's view,

Plaintiffs' argument is a stretch, to say the least.  The relevant inquiry here is if, in enacting the

ATSA, Congress intended the term "termination" to encompass a reduction-in-force.  The plain

meaning of "termination" encompasses a reduction-in-force.  Plaintiffs offer no evidence that

suggests Congress intended otherwise.  One unpublished case from the Northern District of

Illinois demonstrating that a legislature differentiated between the terms *in a different statute* is

insufficient.

Plaintiffs further argue that a "notwithstanding" provision cannot negate an earlier

provision of the same law.  Pls.' Opp'n at 14.  Rather, Plaintiffs contend that a longstanding rule

of construction "mandate[s] that statutes be construed to give effect to every clause." *United

States v. Rodriguez*, 26 F.3d 4, 8, (1st Cir. 1994); *see also Tobey v. NLRB*, 40 F.3d 469, 471

(D.C. Cir. 1994).  Defendant points out that a "provision that applies 'notwithstanding any other

provision of law' may override not only provisions of some other Act but also other provisions

contained in the same Act."  Def.'s Reply at 12 (citing *Liberty Maritime Corp. v. United States*,

928 F.2d 413, 416-17 & n. 4 (D.C. Cir. 1991)).  Defendant notes too that "Section 111(d)

conveys its authority '[n]otwithstanding <u>any</u> <u>other</u> provision of law,' rather than, as AFGE would

have it, '[n]otwithstanding <u>any</u> provision of <u>other</u> law.'" *Id.*  A "notwithstanding" provision may

indeed negate an earlier provision of the same law, if Congress so intends.  A rule of statutory

construction cannot impede that power.  For that and other reasons discussed *supra*, Section

III(A), the Court rejects Plaintiffs' interpretation of the ATSA.

For the foregoing reasons, the Court finds that the plain text of Section 111(d) clearly

signals Congress's intention to grant the TSA Under Secretary authority to design a personnel

management system for airport security screeners, to include or not include at the Secretary's

discretion provisions of other federal personnel laws, including those in the FAA's personnel

management system in 49 U.S.C. § 40122(g).

        2.    <u>The Legislative History of ATSA Sections 111(d) and 101 Conclusively
Shows that Congress Intended to Invest the Under Secretary with
Authority to Exempt Screeners from the Employee Protections of Federal
Personnel Laws</u>

Not only does the plain text of the statute favor Defendant's interpretation, but the legislative history of ATSA Sections 111(d) (49 U.S.C. § 44935 note) and 101, (49 U.S.C. § 114(n)) conclusively shows that Congress intended to invest the Under Secretary with Authority to exempt airport security screeners from the employee protections of federal personnel laws. The relevant legislative history includes precursor texts of 111(d) and 101, as well as legislators' specific comments about 111(d) in the Congressional Record.

First, precursor texts of ATSA § 111(d) show incontestably that Congress intended to allow the Under Secretary to exempt screeners from the employee protections federal personnel laws, including part III of title 5, United States Code.  The original version of 111(d) in S. 1447, as introduced on September 21, 2001, provided:

> Sec. 10.  Training and employment of security screening personnel.
>
> (f) Authorization of Employment.—The Secretary of Transportation is authorized to employ, appoint, and fix the compensation of such a number of individuals as may be necessary to carry out sections 44901 and 44903 of title 49, United States Code, in accordance with the provisions of part III of title 5, United States Code, without regard to any limitations on number of employees imposed by any other law or Executive Order.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 7 n.20 (F.L.R.A. July 7, 2003).  This provision was amended by the Senate on October 10, 2001 by S. Amdt.. 1854, to read:

> Sec. 10.  Training and employment of security screening personnel.
>
> (d) Expedited personnel process.—
> (1) Authorization of employment.—The Secretary of Transportation may appoint and fix the compensation of such a number of individuals as may be necessary to carry out section 44901 and 44903 of title 49, United States Code, in accordance with the provisions of part III of title 5, United States Code, without regard to any limitations on number of employees imposed by any other law or Executive Order.
> (2) Strikes prohibited.—An individual employed as a security screener is prohibited from participating in a strike or asserting the right to strike pursuant to section 7311(3) or 7116(b)(7) of title 5.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 8 n.20 (F.L.R.A. July 7, 2003).  The provision

was further amended by S. Amdt. 1881 on October 11, 2001.  The purpose of S. Amdt. 1881 was

"[t]o authorize the employment, suspension, and termination of airport passenger security

screeners without regard to the provisions of title 5, United States Code, otherwise applicable to

such employees."  *In re TSA and AFGE*, No. WA-RP-03-0023 at 8 n.20 (F.L.R.A. July 7, 2003)

(quoting 147 Cong. Rec. S10520 (Oct. 11, 2001)).  S. Amdt. 1881 replaced the above

subsections with:

> (d) Screener personnel.—Notwithstanding any other provision of law, the
> Secretary of Transportation may employ, appoint, discipline, terminate, and fix
> the compensation, terms, and conditions of employment of such a number of
> individuals as the Secretary determines to be necessary to carry out the passenger
> security screening functions of the Secretary under section 44901 of title 49,
> United States Code.
> (e) Strikes prohibited.—An individual employed as a security screener under
> section 44901 of title 49, United States Code, is prohibited from participating in a
> strike or asserting the right to strike pursuant to section 7311(3) or 7116(b)(7) of
> title 5, United States Code.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 7 n.20 (F.L.R.A. July 7, 2003).  No other changes

of significance to this case were made to this provision in S. 1447 that differentiate it from the

final version appearing in Pub. L. 107-71, cited above.

   After examining S. Amdt. 1881 in particular, it is clear that the Senate intended to invest

the Under Secretary with authority to exempt screeners from the employee protections of federal

personnel laws, particularly part III of title 5, United States Code.  The amendment expressly

deletes the requirements from the earlier version that employment of screeners be "in accordance

with the provisions of part III, title 5, United States Code."  A clearer demonstration of the

Senate's intent that employment of screeners need not be "in accordance with the provisions of

part III, title 5, United States Code" is hard to imagine.  As such, the legislative history of

Section 111(d) as it evolved through various drafts in the Senate clearly shows that the Senate

22

intended to grant the Under Secretary broad discretion to exempt screeners from federal personnel laws.

Second, because the House bill with the precursor to ATSA § 101 did not originally contemplate federalization of screeners, the House did not contemplate that the personnel management system called for in ATSA § 101 would apply to screeners.  ATSA § 101 came originally from House bill H.R. 3150, introduced on October 17, 2001.  Section 101 provides that the personnel management system of the FAA apply to TSA employees.  The FAA personnel management system is more "flexible" than that applicable to most federal employees, in that only enumerated employee protections federal personnel laws apply, including whistleblower protection, veterans' preference, non-discrimination, insurance, and appeals to the Merit Systems Protection Board.  *See* 49 U.S.C. § 40122(g).  Importantly, unlike the bill passed by the Senate, the House bill contemplated that section 101's employee protections would not apply to security screeners, because it mandated only federal oversight of screeners, but not federal employment:

> (e) Supervision of screening.—All screening of passengers and property at airports under this section shall be supervised by uniformed Federal personnel of the Transportation Security Administration who shall have the power to order the dismissal of any individual performing such screening.
> (f) Limitation on right to strike.—An individual that screens passengers or property, or both, at an airport under this section may not participate in a strike, or assert the right to strike, against the person (including a government entity) employing such individual to perform such screening.

*In re TSA and AFGE*, No. WA-RP-03-0023 at 9 n.21 (F.L.R.A. July 7, 2003).

Initially, the House rejected the Senate's version of the TSA legislation, rejecting on November 1, 2001 H. Amdt. 384, which would replace the text of H.R. 3150 with text identical to S. 1447.  *Id.*  Some Representatives objected that the Senate bill "gives the [head of the TSA] broad discretion over pay, health care, whistleblower protection, veterans' preference, workers'

compensation, and the right to organize." *TSA and AFGE* at 10 n.21  (F.L.R.A. July 7, 2003)

(quoting 147 Cong. Rec. H7648 (Nov. 1, 2001)).  Another Representative criticized the Senate

bill for not "even giv[ing] these employees the protection of fair labor standards . . .

nondiscrimination acts, all of the law that provides family and medical leave. . . ."  *Id.*  H.R.

3150 – with section 101 but without federalization of screeners – was passed by the House and

sent to conference on November 6, 2001.  As such, the House Representatives clearly

understood that the Senate bill did not provide to security screeners the protections of federal

personnel laws.

The bill that emerged from conference on November 19, 2001 adopted the Senate's

formulation of the Under Secretary's broad authority to determine the terms of employment of

TSA screeners.  Senator John Rockefeller remarked that the "critical matters" of "health care,

worker's compensation, and civil rights and whistleblower protection . . . are left to the

discretion of the Department of Transportation. . . ."  *In re TSA and AFGE*, No. WA-RP-03-0023

at 7 (F.L.R.A. July 7, 2003) (quoting 147 Cong. Rec. S11982 (Nov. 16, 2001)).  House

Representative Janice Schakowsky expressed her "understanding that the Secretary is given the

authority to determine whether [screeners] can join a union; participate in the Federal Employees

Health Benefit Plan and retirement options; and be covered by non-discrimination, health and

safety, and whistleblower laws."  *In re TSA and AFGE*, No. WA-RP-03-0023 at 11 (F.L.R.A.

July 7, 2003) (quoting 147 Cong. Rec. H8313 (Nov. 16, 2001)).  Both Congresspersons

expressed their "hope[s] that the Secretary will act to give those benefits and rights to federal

screeners and security workers."  *Id.*  Importantly, the FAA personnel management system in

Section 101 provides for retirement options, and coverage by non-discrimination, whistleblower,

health and safety laws – if the Congresspersons believed Section 101 applied to security

screeners, they would have neither acknowledged that the Secretary had authority to withhold such protections, nor expressed their hopes that the Secretary would in his discretion choose to provide the protections.  *See* 49 U.S.C. § 40122(g).  It was therefore clear to the Congresspersons that Section 101 did not apply to airport security screeners.

In short, the plain text and legislative history conclusively show that Congress did not intend for ATSA § 101 to apply to airport security screeners.  Instead, in enacting ATSA § 111(d), Congress intended to invest the Under Secretary with authority to exempt airport security screeners from the employee protections of federal personnel laws.[9]  As such, in examining Plaintiffs' Counts I to VII in the following sections, this Court will heed the Supreme Court's admonition in *Chevron*:  "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  *Chevron*, 467 U.S. at 843 n.9.  Because the plain text and legislative history of ATSA § 111(d) are conclusive and unambiguous in their indication of congressional intent, the Court will not proceed with step two of the *Chevron* analysis.  *See Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 399 (D.C. Cir. 2004); *Chevron*, 467 U.S. at 843–44.

B.     *The TSA RIF Did Not Violate the ATSA by Failing to Adopt the FAA Personnel Management System for Security Screeners (Count I)*

---

[9] As in *Springs v. Stone*, "[b]oth parties devote discussion in their memoranda to the implications of *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) on this case.  Defendant contends that the TSA Under Secretary's interpretation of ATSA § 111(d) should be accorded *Chevron* deference.  Plaintiff, obviously, argues otherwise."  362 F. Supp. 2d at 697 n.8.  As in *Springs*, "*Chevron* has no bearing on the resolution of [Defendant's] Motion," because "[i]f the intent of Congress is clear, that is the end of the matter;  for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress" as determined employing traditional tools of statutory construction, including a statute's legislative history.  *Chevron*, 467 U.S. at 842-43; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987); *Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172 (D.C. Cir. 2003); *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.Supp.2d 114, 134 (D.D.C. 1999).

In Count I, Plaintiffs claim that the TSA RIF violated the ATSA, because "ATSA [§ 101] explicitly mandates that the Federal Aviation Administrations's (FAA) personnel management system as defined in 49 U.S.C. § 40122 shall apply to" TSA security screeners.  *See* Compl. ¶¶ 20-21, 38-39 (Count I – ATSA 101).

As discussed above, ATSA § 101 does not apply to TSA security screeners.  ATSA § 101 directs the TSA to establish for most of its employees the FAA personnel management system in 49 U.S.C. § 40122.  ATSA § 111(d) grants the TSA Under Secretary authority not to establish such a personnel management system for airport security screeners.  Consequently, the May 2003 TSA RIF of security screeners did not violate the ATSA by allegedly failing to follow FAA personnel management practices pursuant to 49 U.S.C. § 40122.  Count I of Plaintiffs' Complaint is therefore dismissed.

> C.   *The TSA RIF Did Not Violate the ATSA and Veterans' Preference Act of 1944, 5 U.S.C. § 3901 et seq., by Not Taking Into Account Military Service, Tenure of Employment, and Efficiency Ratings (Count II)*

In Count II, Plaintiffs claim that the May 2003 TSA RIF violated the ATSA and Veterans' Preference Act of 1944 by not taking into account military service, tenure of employment, and efficiency ratings.  Compl. ¶¶ 40-41 (Count II – VPA).  Plaintiffs argue that ATSA § 101 mandates that FAA's personnel management system under 49 U.S.C. § 40122 applies to TSA security screeners.  *See* ATSA § 101, 49 U.S.C. § 114(n).  Plaintiffs contend that "[p]ursuant to §40122(g)(1), [the] FAA expressly incorporates the provisions of Title 5 relating to sections 2208-3320 for veterans' preference," and "[t]he FAA RIF procedures are consistent with the Veterans' Preference Act of 1944."  Compl. ¶¶ 22-25.

As discussed above, while ATSA § 101 directs the TSA to establish for most of its employees the FAA personnel management system in 49 U.S.C. § 40122, ATSA § 111(d) grants

the TSA Under Secretary authority not to establish such a personnel management system for airport security screeners.  In enacting ATSA § 111(d) Congress intended to invest the Under Secretary with authority to exempt airport security screeners from the employee protections of federal personnel laws, including the Veterans' Preference Act of 1944, 5 U.S.C. § 3501 *et seq*. (contained within part III of title 5, United States Code).  Consequently, the May 2003 TSA RIF did not violate either 49 U.S.C. § 40122 or the Veterans' Preference Act of 1944 by allegedly failing to comport with these laws.  Count II of Plaintiffs' Complaint is therefore dismissed.

   D.   *The Court Does Not Have Jurisdiction to Review the TSA RIF Standard Under the APA Because ATSA § 111(d) Commits Design of a RIF to Agency Discretion (Count III)*

In Count III, Plaintiffs claim that "[t]he TSA RIF 'standard' is arbitrary and capricious agency action in violation of the APA, 5 U.S.C. § 706."  *See* Compl. ¶¶ 42-43 (Count III – APA).  By the RIF "standard," Plaintiffs refer to the fact that the first phase of the RIF incorporated only a conduct checklist, which identified previously documented on-the-job conduct and performance issues.  Whitford Decl. ¶¶ 22, 25.  Approximately 800 TSA screeners were terminated via letters on May 23 and May 30, 2003 in this phase.  Compl. ¶ 30; *Springs*, 362 F. Supp. 2d at 692.  In Count III, Plaintiffs incorporate by reference their allegations that the RIF standard "does not follow FAA RIF procedures and (1) places undue emphasis on de minimis memoranda of counseling and/or disciplinary actions, (2) does not preserve permanent before temporary employees, (3) does not distinguish between positions, (4) does not consider length of federal service, (5) does not preserve veterans' preference, and (6) does not create restoration rights."  Compl. ¶ 39.  Plaintiffs argue that these failures are arbitrary and contrary to law because "[t]he ATSA explicitly mandates that the Federal Aviation Administration's (FAA) personnel management system as defined in 49 U.S.C. § 40122 shall apply to [screeners]," and

27

the FAA incorporates in its RIF standards veterans' preference, preference for permanent as opposed to temporary employees, length of federal service, and restoration rights pursuant to 49 U.S.C. § 40122(g)(1).  *See* Compl. ¶¶ 20-25.  For the reasons that follow, the Court concludes that because ATSA § 111(d) commits to TSA's discretion the design of RIF standards, the agency's action is unreviewable.

The Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.  *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (courts will uphold a decision of less than ideal clarity if the agency's rationale may reasonably be discerned); *see also Cellco P'ship v. Fed. Commc'ns Comm'n*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (noting "arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment.") (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  However, judicial review of agency actions is allowed under the APA, "except to the extent that . . . agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Courts "begin with the strong presumption that Congress intends judicial review of administrative action," but hold themselves without jurisdiction to conduct a review in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."  *Springs*, 362 F. Supp. 2d at 702-03 (quoting *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) and *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).  "There is no law to apply if

'the statute is drawn so that a court would have no meaningful standard against which to judge

the agency's discretion.'" *Springs*, 362 F. Supp. 2d.at 703 (quoting *Heckler v. Chaney*, 470 U.S.

821, 830 (1971)).

    In this case, Plaintiffs ask the Court to review the TSA's RIF standard against FAA RIF

standards that Plaintiffs contend the TSA was bound to follow under 49 U.S.C. § 114(n).  In the

foregoing analysis, the Court determined pursuant to the first step of the *Chevron* analysis that

49 U.S.C. § 114(n) does not apply to TSA airport security screeners.  *See supra* § III(A).  The

ATSA "offers no guidance on how TSA should implement a RIF," but instead ATSA § 111(d)

"explicitly authorizes the exercise of broad discretion not constrained by the judicial review

provisions contained in the APA."  *Springs*, 362 F. Supp. 2d at 703; *see also AFBE v. FLRA*, 46

F.3d 73, 76 (D.C. Cir. 1995); *Colorado Nurses Assoc. v. FLRA*, 851 F.2d 1486, 1489 (construing

a statute similar to ATSA § 111(d) to provide an agency with "unfettered discretion").

Consequently, any judicial review of the TSA's RIF standard would both lack any legal basis or

legal standard against which to measure its capriciousness, and would fail to respect Congress's

express intent that the TSA have broad discretion in making employment decisions for security

screeners.  *See Springs*, 362 F. Supp. 2d at 703 ("the sweeping nature of ATSA § 111(d)

exempts the TSA from adhering to the FAA RIF procedures . . . and the ATSA itself contains no

provisions directing TSA how to implement RIFs against which this Court could scrutinize

TSA's conduct.  In addition, ATSA § 101(n), 49 U.S.C. § 114(n), grants the Under Secretary the

authority to make appropriate modifications to the FAA personnel management system, the

default system put in place by Congress.  There is simply nothing to which this Court could turn

to evaluate whether the RIF standards developed by TSA were arbitrary or capricious.") (internal

citations omitted).  In short, ATSA § 111(d) grants the TSA discretion to incorporate or not

incorporate in its RIF the termination criteria Plaintiffs complain were not incorporated.  This

Court does not have jurisdiction to review that exercise of discretion.  Count III of Plaintiffs'

Complaint is therefore dismissed.

> E.    *Plaintiff's Claim that the TSA RIF Violated the Age Discrimination in Employment Act by Disparately Impacting Screeners Over 40 Years Old Fails to State a Claim (Count IV)*

In Count IV, Plaintiffs claim that "[t]he RIF procedure violates the Age Discrimination in

Employment Act (ADEA), 29 USCA § 621 et seq., in that it disparately impacts employees over

40 years old."  *See* Compl. ¶¶ 44-46 (Count IV – ADEA).  Because the ADEA is not part of

federal personnel laws, TSA's security screeners are entitled to the ADEA's protection.  *See*

*supra*, Section III(A).  Plaintiffs' ADEA claims shall be dismissed, however, because under the

ADEA, claims of discrimination based on disparate impact are not cognizable.

A claim of disparate impact is predicated on "proof that the employer utilizes

'employment practices that are facially neutral in their treatment of different groups but . . . in

fact fall more harshly on one group than another and cannot be justified by business necessity.'"

Def.'s Mem. to Dismiss at 23 (quoting *Mullin v. Raytheon Co.*, 164 F.3d 696, 699-700 (1st Cir.

1999) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97

S.Ct. 1843 (1977))).  Defendant points out that

> Although neither the Supreme Court nor this Circuit has expressly decided the issue, *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("we have never decided whether a disparate impact theory of liability is available under the ADEA"); *Koger v. Reno*, 98 F.3d 631, 639 (D.C. Cir. 1996) ("assum[ing] without deciding that disparate impact analysis applies to age discrimination claims"); two District of Columbia district court decisions subsequent to *Koger* have concluded that the ADEA does not allow for disparate impact claims.  *See Evans v. Atwood*, 38 F. Supp. 2d 25, 30 (D.D.C. 1999) (finding ADEA does not allow for disparate impact claims because its text does not specifically provide for such claims); *Hyman v. First Union Corp.*, 980 F. Supp. 38, 41 (D.D.C. 1997) (finding

claim of liability based on disparate impact theory not cognizable under ADEA). In addition, the D.C. Circuit recently has observed (in a different context) that the Supreme Court "has been reluctant to extend the disparate impact theory to other laws prohibiting discrimination even where the statutory language bears greater resemblance," citing *Hazen* as an example. *Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1060 (D.C. Cir. 2003) . . . As the Tenth Circuit has held, "[t]he [Supreme] Court, although not expressly ruling on the issue, indicated in dicta that the ADEA only prohibits intentional discrimination. *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1008 (10th Cir. 1996).

Def.'s Mem. to Dismiss at 23-24.

To counter this argument, Plaintiffs submit only that "[w]hile Defendant is accurate that two U.S. District Courts for the District of Columbia have found that the language of the ADEA does not support a finding of disparate impact liability, this Circuit has not so ruled.  Thus, while the lower court rulings are persuasive, they are not binding."  Pls.' Reply at 18.  While so much is true, two rulings from the instant District that claims of discrimination based on disparate impact are not cognizable under the ADEA are far more persuasive to this Court than Plaintiffs' mere assertion that those rulings are not binding and a complete lack of argument supporting an alternate finding.  *Hyman* and *Evans* both firmly concluded that "the ADEA does not allow for disparate impact claims," after examining relevant Supreme Court precedent including *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), circuit court decisions including *Ellis v. United Airlines, Inc., Inc.*, 73 F.3d 999 (10th Cir. 1996), and the text, legislative history, and policies underlying the ADEA.  *See Hyman*, 980 F. Supp. at 40-41; *Evans*, 38 F. Supp. 2d at 30. Plaintiffs supply no analysis critical of these District Court decisions; Plaintiffs discuss no cases with alternative findings; Plaintiffs set forth no arguments for why claims of disparate impact are or should be cognizable under the ADEA.  It is not this Court's function to supply these arguments in Plaintiffs' stead and then rule on them.  As such, the Court will simply follow

*Hyman* and *Evans* in holding that Plaintiffs' claims of discrimination based on disparate impact are not cognizable under the ADEA.

Under Rule 12(b)(6), "Plaintiffs' factual allegations must be presumed true and should be liberally construed in favor of plaintiffs." *Hyman*, 980 F. Supp. at 39 (citing *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979)). "The complaint should be dismissed only if it appears beyond doubt that no set of facts proffered in support of plaintiffs' claim would entitle them to relief." *Id.* (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). Here, there is no set of facts proffered that would entitle Plaintiffs to relief on their claim of disparate impact under the ADEA – that claim is not legally cognizable, whatever the supporting facts. Count IV of Plaintiffs' Complaint is therefore dismissed.

> F.    *Plaintiffs Lack Standing to Pursue Their Claim that the TSA RIF Violated the ATSA § 110(c) by Not Deploying "a sufficient number of Federal screeners" (Count V)*

In Count V, Plaintiffs claim that "Defendant violated ATSA in that it did not deploy within the year requirement 'a sufficient number of Federal screeners' to conduct screening of all passengers." *See* Compl. ¶¶ 47-48 (Count V – ATSA 110(c)). Plaintiffs lack standing to pursue this claim.

A party seeking judicial review of administrative agency action under the APA must establish both constitutional and prudential standing.[10]  *See American Federation of Gov't*

---

[10] Plaintiffs have not specified the statute authorizing them to sue the TSA for the alleged violation of ATSA § 110(c). *See* Compl. ¶ 48 ("Defendant violated ATSA in that it did not deploy within the year requirement 'a sufficient number of Federal screeners' to conduct the screening of all passengers."). The Court can only assume that Plaintiffs seek review of the TSA's alleged violation of this provision under the APA; the prospect that Congress intended to create a private cause of action for a violation of ATSA § 110(c)(1) does not warrant a discussion. *See Alexander v. Sandoval,* 532 U.S. 275, 286-87 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist

*Employees, Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) (citing *Ass'n of Data
Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 53 (1970) ("*Data Processing*")).  Constitutional
standing requires a party to show an "injury-in-fact."  *Data Processing*, 397 U.S. at 153.
Prudential standing requires a party to demonstrate that "the interest it seeks to protect is
'arguably within the zone of interests to be protected or regulated by the statute . . . in question."
*Sierra Club v. EPA*, 292 F.3d 895, 902 (D.C. Cir. 2002) (quoting *Data Processing*, 397 U.S. at
153); *see also Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883 (1990) (citing *Clarke v.
Securities Industry Ass'n*, 479 U.S. 388, 396-397 (1987); *NFFE v. Cheney*, 883 F.2d 1038, 1042-
43 (D.C. Cir. 1989).

To apply the "zone of interests" test, a court must "first discern the interests 'arguably . . .
to be protected' by the statutory provision at issue; [the court must] then inquire whether the
plaintiff's interests affected by the agency action in question are among them."  *Cohen* 171 F.3d
at 469 (quoting *National Credit Union Admin. v. First Nat'l Bank & Trust,* 522 U.S. 479, 118
S.Ct. 927, 932 (1998) ("*NCUA*")).  Courts examine "Congress's intent in enacting [the relevant
statute] in order to determine whether [plaintiffs] were meant to be within the zone of interests
protected by those statutes."  *Air Courier Conference v. American Postal Workers Union*, 498
U.S. 517, 523-24 (1991).  The zone of interests test "denies a right of review if the plaintiffs'
interests are so marginally related to or inconsistent with the statute that it cannot reasonably be
assumed that Congress intended to permit the suit."  *Clarke v. Securities Indus. Assoc.*, 479 U.S.
388, 399 (1987).

In this case, Plaintiffs challenge the TSA's implementation of ATSA § 110(c), which
reads:

and courts may not create one, no matter how desirable that might be as a policy matter,
or how compatible with the statute.").

> Not later than 1 year after the date of enactment of this Act, the Under Secretary
> of Transportation for Security shall deploy at all airports in the United States
> where screening is required under section 44901 of title 49, United States Code, a
> sufficient number of Federal screeners, Federal Security Managers, Federal
> security personnel, and Federal law enforcement officers to conduct the screening
> of all passengers and property under section 44901 of such title at such airports.

Pub. L. 107-71, 115 Stat. 597, 616, 49 U.S.C. § 44901 note.  This Court must first discern the

interests "arguably . . . to be protected" by this provision.  These interests could not be more

obvious.  Less than ten weeks after the September 11, 2001 terrorist hijackings of four

commercial airliners, Congress enacted the Aviation and Transportation *Security* Act ("ATSA"),

Pub. L. No. 107-71, 115 Stat. 597 (2001), captioned "An act to improve airport security, and for

other purposes."  The provision above was meant to deploy the Act's new security measures as

rapidly as possible.

The Court next inquires whether the TSA security screeners' interest in protecting their

employment is arguably to be protected by the provision.  Clearly, Congress directed that a

"sufficient number of Federal screeners" be deployed to "conduct the screening of all passengers

and property," in order to "improve airline security," not to provide employment opportunities.

Congress directed that the federalization take place "[n]ot later than 1 year after the date of

enactment of this Act" as a security measure to prevent a second September 11th, not as an

employment program.  In addition, as Defendant points out, "Plaintiffs' interest in securing a de

facto status quo distribution of screeners is particularly inconsistent with ATSA's purpose to

ensure aviation security in a time where the reality of budget constraints has forced TSA to

reassess how most effectively to deploy its screener workforce."  Def.'s Reply at 6.  Finally,

Congress unambiguously intended with ATSA 111(d) to invest the Under Secretary of

Transportation for Security with broad discretion to hire and fire security screeners.

In *Air Courier Conference v. American Postal Workers Union*, the Supreme Court

reversed a Court of Appeals ruling that U.S. postal workers had prudential standing to challenge

a rule suspending the Postal Service's statutory monopoly in the international remailing market.

498 U.S. 517.  The Court of Appeals had held that the Postal Service employees' "interest in

preventing the reduction of employment opportunities" "plausibly relate[d]" to the intended

purpose of the challenged rule – protection of revenue for the Postal Service.  *Id.* (quoting 891

F.2d 304, 310).  The Supreme Court called this view "mistaken," stating that the statutes at issue

indicated "congressional concern [] not with opportunities for postal workers but with receipt of

necessary revenues for the Postal Service.  *Id.* at 525-26.  The Court illustrated its ruling by

reciting an example from *Lujan*:

> [T]he failure of an agency to comply with a statutory provision requiring 'on the
> record' hearings would assuredly have an adverse effect upon the company that
> has the contract to record and transcribe the agency's proceedings;  but since the
> provision was obviously enacted to protect the interests of the parties to the
> proceedings and not those of the reporters, that company would not be 'adversely
> affected within the meaning' of the statute.

*Air Courier Conference*, 498 U.S. at 526 (quoting *Lujan*, 497 U.S. at 883).

Similarly, it is abundantly clear that ATSA § 110(c)(1), requiring the Under Secretary of

Transportation to deploy "a sufficient number of Federal screeners" not later than one year after

November 19, 2001, was meant to protect the interests of the traveling public, and not the

employment of the screeners.  *See Springs*, 662 F. Supp. 2d at 705 ("A mere modicum of

common sense reveals that the purpose of § 110(c)(1) was to ensure that a sufficient airport

security apparatus was put in place as soon as possible, and not to extend any form of civil relief

in the event that the benchmark was not attained.").  Plaintiff employees in this case cannot

demonstrate that this provision was meant to protect their job security.  As such, they lack

standing to pursue this claim.  Plaintiffs' Count V is therefore dismissed.

G.      *No Plaintiff, Except Plaintiff Card, Has Alleged that His Union Activities,
        Protected by the First Amendment, Were a Substantial Motivating Factor in His
        Selection for the RIF (Count VI)*

In Count VI, Plaintiffs claim that "[t]he RIF standard as applied disparately impacted on

union activists and as such abrogates Plaintiffs' right of free association under the First

Amendment of the U.S. Constitution."  *See* Compl. ¶¶ 49-51 (Count VI – 1st amend.).  This

Count shall be dismissed with respect to all Plaintiffs except Plaintiff Card because there is no

disparate impact theory in First Amendment law, and because Plaintiffs, except Plaintiff Card,

have failed to state a claim because they have not alleged that their union activity was a

substantial motivating factor in their selection for the RIF.

First Amendment claims by government employees must satisfy a four-part test to

succeed:  (1) The employee must have been speaking on a matter of public concern; (2) the

employee's interest in speaking must outweigh the government's interest in promoting the

efficiency of public services; (3) the employee must show that his speech was a substantial

motivating factor in prompting the retaliatory act of which he complains; and (4) the employee

must negate the employer's showing, by a preponderance of the evidence, that the employer

would have reached the same decision even in the absence of the protected conduct.  *AFGE v.*

*Loy*, 332 F. Supp. 2d 218, 227-28 (D.D.C. 2004) (citing *Taylor v. Resolution Trust Corp.*, 973 F.

Supp. 178, 182 (D.D.C. 1997); *Edmonds v. United States Dep't of Justice*, 323 F. Supp. 2d 65,

78-79 (D.D.C. 2004) (citations omitted); *Orange v. District of Columbia*, 59 F.3d 1267, 1272

(D.C. Cir. 1995); *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988)).  The first two parts are

matters of law, while the latter two are questions of fact.  *Id.* at 227.  Membership in a labor

union is a matter of public concern.  *Id.*; *see also Am. Postal Workers Union, AFL-CIO v. U. S.*

*Postal Serv.*, 830 F.2d 294 (D.C. Cir. 1987) ("The urge to unionize certainly falls within the

category of expression that is 'fairly considered as relating to any matter of political, social, or other concern to the community . . . .'") (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

In this case Plaintiffs have failed to state a claim upon which relief can be granted under First Amendment law because, first, there is no disparate impact theory in First Amendment law, and, second, except for Plaintiff Card, Plaintiffs have failed to allege in any way that their union activities were a substantial motivating factor in prompting their dismissal during the late May 2003 reduction-in-force.

First, Plaintiffs assert a First Amendment claim under a theory that they themselves admit cannot form the basis of a claim under First Amendment law. Plaintiffs argue that "[t]he RIF standard as applied disparately impacted on union activists and as such abrogates Plaintiffs' right of free association under the First Amendment of the U.S. Constitution," while concomitantly conceding that "there is 'no disparate impact theory in First Amendment law.'" Pls.' Mem. for Prelim. Inj. at 15 (quoting *Terry v. Reno*, 101 F.3d 1412, 1419-20 (D.C. Cir. 1996)). As such, Plaintiffs admit that they cannot pursue their First Amendment claim under a disparate impact theory.

Second, Plaintiffs have failed to state a claim because they fail to allege in the Complaint that their union activities were a substantial motivating factor in prompting their dismissal during the late May 2003 reduction-in-force. The only factual allegations concerning union activities in the Complaint are: (1) an allegation that Plaintiff Leimer "was an AFGE activist" and "wrote a letter to Federal Security Director (FSD) Milano in defense of unions and unionism," (2) Plaintiff Card's declaration that "[m]anagement knew of [his] union activities and [he] was disciplined by TSA for lawfully discussing the union while off duty at the airport's break room," (3) an allegation that Plaintiff Moriarty "was an AFGE activist" and

"[m]anagement knew of his activism as they maintained a list of union supporters . . . ." and (4) all plaintiffs were union activists.  Compl. ¶¶ 4-5, 7, 33 & Ex. 18 (8/12/03 Card Declaration).

Importantly, nowhere do Plaintiffs assert that the TSA based its selection of Plaintiffs for the RIF on union membership.  Plaintiffs assert only that "[t]he arbitrary and capricious nature of whom to RIF *left open the possibility* for large numbers of union activists to be RIFed" because the TSA had previously disciplined screeners for union activities, and the first phase of the RIF incorporated a conduct checklist which documented on-the-job conduct.  Pls.' Mem. for Prelim. Inj. at 15 (emphasis added); Whitford Decl. ¶¶ 11, 20, 22, 25.  Yet Plaintiffs have only alleged in their Complaint that a single Plaintiff – Plaintiff Card – had any documented disciplinary incidents related to union activities which could have been incorporated into his conduct checklist, and hence into TSA's decision to select him for the RIF.  Nowhere do Plaintiffs allege that Defendant specially selected union members for the RIF, or applied to union activists any termination procedure apart from that described by Defendant.[11]  In other words, Plaintiffs fail to allege any causal connection between union activities and termination through the RIF other than the route of disciplinary action - conduct checklist - RIF except for Plaintiff Card.  *Compare AFGE, AFL-CIO v. Loy*, 332 F. Supp. 2d 218, 230 (D.D.C. 2004) ("the plaintiffs maintain that [plaintiff] Ferace's attempts to organize a labor union are causally connected to his termination.").

---

[11] In their pleadings opposing Defendant's Motion to Dismiss, the extent of Plaintiffs' discussion of their 1st Amendment claim is the following:  "TSA's RIF standard as applied violates Plaintiffs' First Amendment rights.  The First Amendment . . . guarantee[s] a government employee the right to [unionize].  In fact, the Supreme Court has characterized 'the right to organize and select representatives for lawful purposes of collective bargaining . . . as a fundamental right . . . .'  When the Defendant used unlawful RIF standards, he violated the Plaintiffs' constitutional and fundamental right to organize collectively and placed an undue and improper chilling effect on their right to engage in associational activities."  Pls.' Opp'n at 19 (citations omitted).

As such, with the exception of Plaintiff Card, Plaintiffs have failed to state a claim under the First Amendment because they fail to allege that their union activity was a substantial motivating factor in prompting their selection for the RIF.  Count VI of Plaintiffs' Complaint is therefore dismissed with respect to all Plaintiffs except Plaintiff Card and AFGE.[12]

> H.    *Plaintiffs Have Failed to State a Claim Under the Fifth Amendment, Because They Fail to Allege that the TSA Press Release Allegedly Stigmatizing RIFed Screeners for Poor Job Performance Seriously Hampered or Precluded Them From Pursuing Their Chosen Profession (Count VII)*

In Count VII, Plaintiffs claim that "[t]he RIF standard as applied abrogates Plaintiffs' due process and liberty interests under the Fifth Amendment of the U.S. Constitution" because "the Defendant has advertised through its press releases it selected employees for the RIF based on prior disciplinary incidents or for poor job performance," and Plaintiffs had no opportunity to contest the conduct checklist upon which their termination was partially based.  *See* Compl. ¶¶ 52-55 (Count VII – 5th amend.).

A claim of deprivation of liberty under the Fifth Amendment may arise when the government imposes upon a terminated employee a stigma or other disability so severe that it forecloses the employee's freedom to take advantage of other employment opportunities within his chosen profession.  *See O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (finding isolated defamatory statements and a demotion insufficient to prove a disabling stigma); *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (finding a university did not violate

---

[12] Defendant's Memorandum in support of its Motion to Dismiss focuses on individual Plaintiffs, only very briefly arguing in a footnote in the context of Plaintiffs' ADEA claim that "[i]t is particularly unlikely that AFGE has associational standing to pursue this claim" because "the suit ultimately will require individualized proof concerning the specific action(s) taken against each employee."  Def.'s Mem. to Dismiss at 22-23 n.15. *See AFGE v. Stone*, 2005 WL 1620402 at *6-7 (S.D. Ohio July 6, 2005) (finding AFGE lacked standing to join union member's First Amendment claim for wrongful termination).  As such, the Court shall allow AFGE to proceed along with Plaintiff Card on Plaintiff Card's First Amendment claim for the time being.

administrators' First Amendment rights, because university report did not foreclose government employment opportunities); *Kartseva v. Department of State*, 37 F.3d 1524, 1527-28 (D.C. Cir. 1994) (finding translator's disqualification from government employment for unknown but potentially serious reasons sufficiently stigmatic to render her unemployable in much of her field).  The Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564 (1972) and *Paul v. Davis*, 424 U.S. 693 (1976) made clear that "defamation alone is not actionable under the due process clause, but that defamation 'in the course of the termination of employment' is" actionable. *O'Donnell*, 148 F.3d at 1140 (quoting *Paul*, 424 U.S. at 710).  The purpose of requiring a demotion or firing is to help "limit the scope of permissible due process claims to a small set of truly serious claims, thus limiting the constitutionalization of tort law." *Id.*  To constrain a liberty interest, the stigma must not be merely unwelcome, but must seriously hamper or "foreclose [] opportunities for future" employment. *Orange*, 59 F.3d at 1274.

In this case, Plaintiffs have failed to allege that any stigma created by TSA was sufficiently serious to constrain their liberty interest.  Plaintiffs allege that a TSA press release of May 30, 2003 that reassured the public that the screener job cuts would have no impact on security or passenger wait times also stigmatized the RIFed employees.  Compl., Ex. 4 (5/30/03 TSA Press Release).  The press release stated that:

> Security continues at the same high level and passenger wait times remain low even as the Transportation Security Administration implements its plan for rightsizing the screener work force publicly announced by TSA Administrator Adm. James M. Loy on April 30.
>
> The rightsizing effort, which started in March, has reduced 3,000 positions from the TSA rolls . . . The plan, driven in part by budget constraints, called for eliminating 3,000 positions by May 31 and another 3,000 by Sept. 30.
>
> "By ensuring that security checkpoints are fully staffed during peak times we have been able to make staffing adjustments that largely have gone unnoticed by travelers," Admiral Loy said.

40

* * *

> "We are staying sharply focused on security as we make these changes," Admiral
> Loy said.  "When we are done, the public will have a leaner, more effective
> screener work force, comprised of the best people for the jobs."
>
> Whenever possible, normal attrition, including resignations and retirements, is
> being used for rightsizing at individual airports.  Employees may be terminated
> for cause, including criminal background, failure to pass drug and alcohol tests,
> and falsification of employment documents.  Beyond that, the actual reductions in
> force are based on job performance.

Compl., Ex. 4 (5/30/03 TSA Press Release).

Upon examination of this allegedly stigmatizing public statement, it is clear for several

reasons that the alleged stigma is not serious enough to deprive Plaintiffs of a liberty interest in

pursuing their chosen profession.  First, nowhere have Plaintiffs alleged that this Press Release

has foreclosed or seriously hampered their opportunities for future employment.  Indeed, the text

of the Press Release cannot support such an inference.  While it mentions job performance as a

criterion in selecting employees for the reduction in force, the Press Release states that

"[w]henever possible, normal attrition, including resignations and retirements, is being used for

rightsizing at" airports.  It also states that the reductions are driven in part by "budget

constraints."  Moreover, all Plaintiffs received separation letters stating that their particular

terminations were "as a result of overstaffing resulting from budget allocations and 'not for

cause.'"  Compl. ¶ 30.  Plaintiffs fail to suggest how these letters would be insufficient to

demonstrate to future potential employers that poor performance was not a factor in their

selection for the RIF.  In fact, Plaintiffs' most serious allegation about the impact of the Press

Release on Plaintiffs is that "Plaintiff Leimer's reputation has also been tarnished in his

community.  As the RIF in Syracuse occurred at the same time as the press was reporting that

Defendant was terminating screeners for criminal backgrounds, his neighbors wrongfully

believed that he was terminated for cause." Pls.' Mem. for Prelim. Inj. at 16.  Under the above-articulated standards for establishing a claim of deprivation of liberty based on stigmatizing public statements, this claim is woefully insufficient.

Finally, the Press Release does not name any individual Plaintiffs.  No cases cited by Plaintiffs or reviewed by this Court have involved public statements impugning an unnamed class of discharged employees; rather, all cases have involved public statements impugning specific named employees.  The stigmatizing public statements in these cases were of such gravity that the employee was seriously hampered or precluded from pursuing his chosen profession.  *See*, *e.g.*, *Kartseva*, 37 F.3d 1524.  In fact, in all cases cited above apart from *Kartseva*, public statements far more defamatory than those at issue here were found for various reasons not to deprive plaintiffs of a liberty interest.  While on a Motion to Dismiss all reasonable inferences from factual allegations in the Complaint should be drawn in favor of Plaintiffs, an inference that all or any of the RIFed TSA airport security screeners were seriously hampered or "foreclose[d] [from] opportunities for future" employment in the security field due to the allegedly stigmatizing TSA Press Release is simply not reasonable.  *Orange*, 59 F.3d at 1274.

In short, to state a claim of deprivation of liberty to pursue one's chosen profession in violation of the Fifth Amendment, Plaintiffs must allege that a public statement by the government accompanying their discharge was so severe as to preclude or seriously hamper them from obtaining future employment in their chosen field.  Plaintiffs fail to allege that the May 30, 2003 TSA Press Release stigmatized them so severely that it precluded or seriously hampered them from obtaining future employment, and upon examination the Release does not support such an inference.  Count VII of Plaintiffs' Complaint is therefore dismissed.

**IV: CONCLUSION**

For the reasons set forth above, the Court shall grant Defendant's Motion to Dismiss all Plaintiffs' claims except Count VI with respect to Plaintiff Card and Plaintiff AFGE.  An appropriate Order accompanies this Memorandum Opinion.


Date:   August 21, 2006

                                         _____/s/_____
                                         COLLEEN KOLLAR-KOTELLY
                                         United States District Judge